IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NIMROD BENJAMIN and MARNIE BENJAMIN,<br><br>    Plaintiffs,<br><br>  v.<br><br>STATE FARM INSURANCE COMPANY and CLARENDON NATIONAL INSURANCE,<br><br>    Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>Civil No. 15-4123 (JBS/AMD)<br><br><br>**OPINION** |

APPEARANCES:

Jonathan Wheeler, Esq.
LAW OFFICES OF JONATHAN WHEELER
1617 JFK Boulevard, Ste. 1270
One Penn Center
Philadelphia, PA 19103
  Attorney for Plaintiffs

Craig D. Gottilla, Esq., and David F. Swerdlow, Esq.
WINDELS MARX LANE & MITTENDORF
120 Albany Street Plaza, 6th Floor
New Brunswick, NJ 08901
  Attorneys for Defendant State Farm Insurance Company

John Donovan Shea, Esq., and William Wendell Cheney, III, Esq.
LITCHFIELD CAVO LLP
1800 Chapel Ave. West, Ste. 360
Cherry Hill, NJ 08002
  Attorneys for Defendant Clarendon National Insurance

**SIMANDLE**, District Judge:

## Table of Contents

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . .2
II. PROCEDURAL AND FACTUAL BACKGROUND . . . . . . . . . . . . .3
  A. Procedural Background . . . . . . . . . . . . . . . .4
  B. Factual Background . . . . . . . . . . . . . . . . . 6

       1. The Underground Storage Tank and Remediation . . .6
       2. Clarendon Policy, Claim, and Denial . . . . . . .10
       3. State Farm Policy, Claim, and Denial . . . . . . 16
       4. Defendants' Expert Report . . . . . . . . . . . .22
III. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . 25
IV. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . .26
    A. Clarendon . . . . . . . . . . . . . . . . . . . . 28
       1. Section I: "Land" not covered under Coverage A . 29
       2. Section II: "Occurrence" during the policy period .
    . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
       3. Section II: Pollution Exclusion . . . . . . . . .37
       4. Section II: Owned Property Exclusion . . . . . . 46
       5. Pro-Rata, Time on the Risk Allocation . . . . . .53
       6. Bad Faith Claim . . . . . . . . . . . . . . . . .55
    B. State Farm . . . . . . . . . . . . . . . . . . . .56
       1. Section I: "Land" not covered . . . . . . . . . .57
       2. Section II: "Occurrence" during the policy period .
    . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
       3. Section II: Pollution Exclusion . . . . . . . . .64
       4. Bad Faith Claim and Punitive Damages . . . . . . 67
V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 68

**I. INTRODUCTION**

    This is an action by husband and wife Plaintiffs Nimrod and Marnie Benjamin against two insurance companies, Defendant State Farm Insurance Company ("State Farm") and Defendant Clarendon National Insurance ("Clarendon"), as the holders of policies of insurance issued by the Defendants for premises located at 72 Wynnewood Drive, Voorhees, New Jersey 08043. Plaintiffs allege that the Defendants breached their contractual obligations to pay benefits to Plaintiffs for a physical loss to the insured premises, concerning leakage of heating oil from a previously unknown underground storage tank, under their respective policies of insurance. [Docket Item 1-2 at 5-6.] Unbeknownst to

Plaintiffs when they purchased this residential property and
obtained these insurance policies, the underground leakage had
occurred many years prior.

Pending before the Court are State Farm's Motion for
Summary Judgment [Docket Item 27] and Clarendon's Motion for
Summary Judgment [Docket Item 28].

For the reasons set forth below, the Court will grant in
part and deny in part State Farm's Motion for Summary Judgment
and will grant in part and deny in part Clarendon's Motion for
Summary Judgment.

## II. PROCEDURAL AND FACTUAL BACKGROUND[1]

---

[1] For purposes of the instant motion and pursuant to Local Civil
Rule 56.1, the Court looks to Plaintiffs' Complaint [Docket Item
1-2] when appropriate, State Farm's Statement of Undisputed
Material Facts [Docket Item 27-4], Plaintiff's related Counter-
Statement of Undisputed Material Facts [Docket Item 30 at 3-4],
State Farm's Response to the Counter-Statement [Docket Item 35-
1], Clarendon's Statement of Undisputed Material Facts [Docket
Item 28-2], Plaintiff's related Counter-Statement of Undisputed
Material Facts [Docket Item 29 at 3-4], Clarendon's Response to
the Counter-Statement [Docket Item 36 at 4-5], and related
exhibits and documents.
    The Court notes with disapproval Plaintiffs' counsel's
apparent disregard of Local Civil Rule 56.1(a), which requires
the "opponent of summary judgment" to "furnish, with its
opposition papers, a responsive statement of material facts,
addressing each paragraph of the movant's statement, indicating
agreement or disagreement and, if not agreed, stating each
material fact in dispute and citing to the affidavits and other
documents submitted in connection with the motion; any material
fact not disputed shall be deemed undisputed for purposes of the
summary judgment." Plaintiffs' counsel filed no such statement.

## A. Procedural Background

On or about April 29, 2015, Plaintiffs filed a complaint in the Superior Court of New Jersey, Law Division, Camden County against three parties: State Farm, Clarendon, and the U.S. Department of Housing and Urban Development ("HUD"). [Docket Item 1-2 at 2.] Plaintiffs alleged that both State Farm and Clarendon had issued policies of insurance covering Plaintiffs' premises located at 72 Wynnewood Drive, Voorhees, New Jersey ("the Property") and wrongfully failed to pay benefits under those policies after "a release of heating oil from a previously unknown underground heating oil tank." [Id. at 5-6.] Plaintiffs alleged that HUD "was the record owner of [those] premises . . . prior to ownership by Plaintiffs" and knew or should have known about the tank and breached its duty to disclose the presence of

---

Rule 56.1(a) also provides that the opponent may furnish "a supplemental statement of disputed material facts," which Plaintiffs' counsel did here. [Docket Items 30 at 3-4; 29 at 3-4.] Defendants submitted responses to the respective Counter-Statements. [Docket Items 35-1 and 36 at 4-5.]

Accordingly, because Plaintiffs did "not dispute[]" the statements of material fact submitted by Clarendon and State Farm by furnishing "responsive statement[s] of material facts, addressing each paragraph of the movant[s'] statement[s]," Defendants' statements "shall be deemed undisputed for purposes of the summary judgment," L. Civ. R. 56.1(a), unless the record clearly discloses a dispute of material fact. It is not the Court's obligation, however, to comb the extensive record of this case to identify a material factual dispute where the party opposing summary judgment has not done so under Local Civil Rule 56.1(a).

the tank to Plaintiffs. [Id. at 5-7.]

HUD removed the case to federal court on June 17, 2015, pursuant to 28 U.S.C. §§ 1442(a)(1) on the grounds that it had "federal defenses to raise against the action against it, including but not limited to sovereign immunity from suit in state courts, sovereign immunity from suits of this type, absence of privity of contract with Plaintiffs under federal law, [and] failure to state a claim upon which relief may be granted under federal law." [Docket Item 1 at 4.] No party filed a motion to remand at that time.

HUD filed its answer on July 8, 2015. [Docket Item 5.] State Farm, in its answer, filed a cross-claim for contribution "from all other parties, presently named or later impleaded, in the event that State Farm is determined to be liable to plaintiffs." [Docket Item 11 at 6.] HUD filed its answer to the cross-claim on July 28, 2015. [Docket Item 14.]

On November 25, 2015, HUD filed a Motion to Dismiss for lack of jurisdiction. [Docket Item 19.] In lieu of filing a response in opposition, Plaintiffs' counsel filed a letter indicating that "Plaintiffs [did] not oppose entry of an Order granting dismissal of the claims against federal Defendant HUD[.]" [Docket Item 21.] The Court subsequently granted the Motion to Dismiss [Docket Item 22]; ordered dismissal of the

cross-claim against HUD [Docket Item 26]; and terminated HUD as a party on February 26, 2016.

In due course, State Farm filed a Motion for Summary Judgment. [Docket Item 27.] Clarendon filed its Motion for Summary Judgment on the same day. [Docket Item 28.] Plaintiffs filed their respective Responses in Opposition [Docket Items 29, 30]. State Farm filed its Reply [Docket Item 35], as did Clarendon [Docket Item 36.]

**B. Factual Background**

**1. The Underground Storage Tank and Remediation**

Plaintiff Nimrod Benjamin purchased the Property, a foreclosed townhouse, on January 2, 2004. [Docket Item 27-4 ¶ 1.] He and Marnie Benjamin married in 2008. [Docket Item 28-2 ¶ 4.] The Property was constructed in 1976-77; "[a]t the time it was constructed, it was reportedly equipped with an underground heating oil tank ([underground storage tank or] UST) system" (hereinafter "UST"). [Id. ¶¶ 2-3.] Plaintiffs were unaware, at least until 2012 and possibly until May 2014, that the underground heating oil tank existed on the Property. [Docket Item 27-4 ¶¶ 2, 4; 28-2 ¶ 7.][2] At all times during Plaintiffs'

---

[2] To the extent that it is relevant, the Court finds that there is a genuine dispute of material fact as to when Plaintiffs became aware of the existence of the underground heating oil tank, whether 2012 or later, but there is no dispute that Plaintiffs were unaware of the underground tank prior to 2012.

ownership of the Property, it was heated by oil drawn from an above-ground oil tank, which had been previously installed in the garage in 2002. [Docket Items 27-4 ¶ 3; 28-2 ¶¶ 9-10.] Although a Voorhees township official notified Mr. Benjamin by letter on January 3, 2012 that the Property contained a UST "that did not appear to be in use," the Benjamins did not believe that the instructions regarding the UST in that letter were applicable to them since they did not know a UST was on the property and were aware only of the above-ground tank. [Docket Item 28-2 ¶¶ 12-14.]

In late May of 2014, Plaintiffs hired Superior Tank and Energy Company of Bristol, Pennsylvania, to remove the UST and dispose of it. [Docket Item 27-4 ¶ 5.] When it was removed, 200 gallons of oil were reportedly pumped out of the UST and transported to be recycled. [Docket Item 28-2 ¶ 18.] At that time, a municipal inspector who was present suspected a fuel oil discharge, the New Jersey Department of Environmental Protection ("NJDEP") was notified, and Plaintiffs were directed to remediate the Property by notice dated May 30, 2014. [Docket Item 27-4 ¶ 6.]

Plaintiffs subsequently hired Moore's Tank Services, Inc. ("Moore's") to investigate potential soil and groundwater contamination in the area where the UST had been; on July 21,

2014, Moore's collected soil samples and subsequently found fuel-oil impacted soil in the side yard and under the garage. [Docket Item 28-2 ¶¶ 21-22.] Moore's also determined that groundwater had been contaminated by fuel oil. [Id. ¶ 23.] Moore's issued a report to the Benjamins on August 27, 2014, wherein it stated:

(1) Soil contamination extended from the location of the UST along the side of the house, about 12 feet into the yard toward the midpoint of the house, ended "near at the rear of the house," and extended under the house;

(2) Contamination did not migrate toward the street or the garage in the vicinity of the former tank;

(3) Contaminated soil appeared to increase away from the location of the UST toward the rear of the property and was encountered closer to the surface further from that location (Mr. Moore believed this suggested "the possibility of a second source of contamination or an older spill that has migrated";

(4) Elevated benzene levels indicated apparent degradation of the heating oil and "suggest[ed] an older spill";

(5) The Benjamins should immediately begin remediation; and

(6) "Age dating at least one sample, but three are

recommended, will indicate the age of the plume."

[Docket Items 28-2 ¶¶ 24-26; 27-4 ¶ 8, citing Docket Item 27-2

at 67-69.]

Plaintiffs had Precision Testing Labs, Inc., test the soil

as recommended by Moore's. Precision issued a report on

September 4, 2014, stating that the "C&L age of the petroleum on

[the relevant sample] is estimated to be **greater than 20 years**

**old**." [Docket Items 28-2 ¶ 28; 27-4 ¶ 9, citing Docket Item 27-2

at 71 (emphasis in original).] Precision's report continued:

"The model [we used to determine this] can estimate the age of

#2 heating oil (or diesel fuel) up to 20 years old within a

range of plus or minus two years." [Docket Item 27-2 at 72.]

Plaintiffs hired Moore's to remediate the soil and

groundwater that reflected the existence of the heating oil and

to prepare a Remedial Action Report. [Docket Items 28-2 ¶ 30;

28-5 at 4-23.] In the course of the remediation process, Moore's

excavated and replaced 221.2 tons of impacted soil (reflecting

an area of 35' x 20' x 10.5' deep or a volume of approximately

272 cubic yards [Docket Item 27-2 at 114]) and another

contractor, Monarch Environmental Services, pumped out 278

gallons of groundwater from the excavation site. [Docket Item

28-5 at 10-12.] The area excavated was entirely within

Plaintiffs' property; there was no evidence uncovered by Moore's that heating oil had spread to either soil or groundwater beyond the property line. [Docket Item 28-5 at 19.]

The NJDEP issued a No Further Action Letter on May 15, 2015, and Plaintiffs sold the townhouse on July 6, 2015. [Docket Item 28-2 ¶¶ 39-40.]

## 2. Clarendon Policy, Claim, and Denial

Clarendon issued a homeowner's insurance policy ("Clarendon Policy") to Plaintiff Nimrod Benjamin with a policy period of January 2, 2005 to January 2, 2006 for the Property. [Docket Item 28-5 at 48.] The Clarendon Policy was divided into Section I, "Property Coverages," and Section II, "Liability Coverages." [Docket Item 28-5 at 51, 60.] Before both sections the policy included a "Definitions" section. [Id. at 50.]

Section I included five subsections, A through D and "Additional Coverages"; Coverage A covered the "Dwelling," Coverage B, "Other Structures," Coverage C, "Personal Property," Coverage D, "Loss of Use," and the fifth subsection, "Additional Coverages." [Id. at 51-55.] Section I also contained further subsections as follows: "Perils Insured Against" [id. at 55], "Exclusions" [id. at 57], and "Conditions" [id. at 58-60].

Section II included two subsections, E and F; Coverage E covered "Personal Liability," and Coverage F, "Medical Payments

to Others." [Id. at 60.] Section II also contained further subsections as follows: "Exclusions" [id. at 61-63], "Additional Coverages" [id. at 63], and "Conditions" [id. at 64].

The Clarendon Policy also contained a further subsection, entitled "Sections I and II--Conditions." [Id. at 64.]

After Section I, Section II, and "Sections I and II--Conditions," the Clarendon Policy contained a number of endorsements which changed the policy. [Id. at 66-81.] They were as follows:

(a)    "Replacement or Repair Cost Protection Endorsement" [id. at 66];

(b)    "Personal Property Replacement Cost" [id. at 67];

(c)    "Amendatory Endorsement - New Jersey" [id. at 68-69];

(d)    "Special Provisions - New Jersey" [id. at 70-76];

(e)    "Limited Fungi, Wet or Dry Rot, or Bacteria Coverage" [id. at 77-79]; and

(f)    "Workers' Compensation - Residence Employees, New Jersey" [id. at 80-81].

The provisions in the Clarendon Policy relevant to this action are outlined as follows, in the order in which they appear within the Policy:

Definitions:
. . .
5. "Occurrence" means an accident, including continuous or repeated exposure to substantially the

same general harmful conditions, which results, during
the policy period, in:
    a. "Bodily injury"; or
    b. "Property damage."
6. "Property damage" means physical injury to,
destruction of, or loss of use of tangible property.
. . .

Section I - Property Coverages
Coverage A - Dwelling
We cover:
1. The dwelling on the "residence premises" shown in
   the Declarations, including structures attached to
   the dwelling; and
2. Materials and supplies located on or next to the
   "residence premises" used to construct, alter or
   repair the dwelling or other structures on the
   "residence premises."
This coverage does not apply to land, including land
on which the dwelling is located.
. . .

Section I - Perils Insured Against
Coverage A - Dwelling and Coverage B - Other
Structures
We insure against risk of direct loss to property
described in Coverages A and B only if that loss is a
physical loss to property. We do not insure, however,
for loss:
. . .
2. Caused by:
    . . .
    e. Any of the following:
        (1) Wear and tear, marring, deterioration;
        (2) Inherent vice, latent defect, mechanical
        breakdown;
        (3) Smog, rust or other corrosion, mold, wet
        or dry rot;
        . . .
        (5) Discharge, dispersal, seepage,
        migration, release or escape of pollutants
        unless the discharge, dispersal, seepage,
        migration, release or escape is itself
        caused by a Peril Insured Against under
        Coverage C of this policy.
        Pollutants means any solid, liquid, gaseous
        or thermal irritant or contaminant,
        including smoke, vapor, soot, fumes, acids,

12

alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

. . .

3. Excluded under Section I - Exclusions.
Under Items 1. And 2., any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

. . .

Section I - Exclusions

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

    a. Ordinance or Law, meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

. . .

Section I - Conditions

. . .

7. Other Insurance. If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. Suit Against Us. No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

. . .

Section II - Liability Coverages

Coverage E - Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damages" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or

suit that we decide is appropriate. Our duty to settle
or defend ends when the amount we pay for damages
resulting from the "occurrence" equals our limit of
liability.
. . .
Section II - Exclusions
1. Coverage E - Personal Liability and Coverage F -
Medical Payments to Others do not apply to "bodily
injury" or "property damage":
     . . .
     c. Arising out of the rental or holding for
rental of any part of any premises by an "insured."
This exclusion does not apply to the rental or holding
for rental of an "insured location":
          (1) On an occasional basis if used only as a
          residence;
          (2) In part for use only as a residence,
          unless a single family unit is intended for
          use by the occupying family to lodge more
          than two roomers or boarders; or
          (3) In part, as an office, school, studio or
          private garage;
. . .
2. Coverage E - Personal Liability, does not apply to:
. . .
     b. "Property damage" to property owned by the
     "insured";
. . .
Amendatory Endorsement - New Jersey
This endorsement changes the policy. Please read it
carefully.
Under Item 2. Coverage E - Personal Liability,
exclusion g. is added:
g. A loss caused by dumping, discharge or escape of
irritants, pollutants or contaminants. Any loss, cost
or expense arising out of any governmental direction
or request that you test for pollutants. Any loss,
cost or expense arising out of any governmental
direction or request that you watch for pollutants.
Any loss, cost or expense arising out of any
governmental direction or request that you clean up or
remove pollutants. Any loss, cost or expense arising
out of any governmental direction or request that you
control or treat pollutants. Any loss, cost or expense
arising out of any governmental direction or request
that you detoxify or neutralize pollutants.

14

A pollutant is any solid or liquid irritant or contaminant.

A pollutant is also any gaseous or thermal irritant or contaminant. A pollutant can be smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. The definition of waste includes materials that can be recycled, reconditioned or reclaimed.

These exclusions are not valid if the loss was sudden and accidental.
. . .
This endorsement changes the policy. Please read it carefully.
Special Provisions – New Jersey
. . .
Section I – Exclusions
1. Ordinance or Law is deleted and replaced by the following:
1. Ordinance or Law, meaning any ordinance or law:
> . . .
> c. Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any respond to, or assess the effects of, pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

[Docket Item 28-5 at 50-73.]

Plaintiffs contacted American Claims Management, the third party administrator for Clarendon, in August 2014 to report a claim under the Clarendon Policy for removal of the UST and the attendant remediation. Clarendon acknowledged the claim and requested additional documentation, which Plaintiffs provided. This information included Moore's initial report. On November 24, 2014, American Claims Management, on behalf of Clarendon,

denied Plaintiffs' claim. [Docket Item 28-2 ¶¶ 47-50.] The claim
was denied because:

> Our [American Claims Management's] investigation has
> concluded that the damage to the UST was due to wear
> and tear, deterioration, rust or other corrosion of
> the oil storage tank. The Policy excludes loss to
> property caused by wear and tear, deterioration or
> rust or other corrosion. Any discharge, dispersal,
> seepage, migration, release or escape of pollutants
> would likewise not be covered by the policy. Given
> that the Policy does not apply to land, including land
> on which the dwelling is located, the remediation of
> soils likewise would fall outside the coverage
> provided by the policy. The loss was not a sudden and
> accidental occurrence.
>
> Lastly, the Policy excludes the costs to comply with
> any ordinance or law which requires you to test,
> monitor, clean up or in any way respond to pollutants
> on any covered building or your property.
>
> Accordingly, the claim for the cost of loss or damage
> associated from your underground storage tank is not a
> covered loss under the policy.

[Docket Item 28-5 at 93-94.] Plaintiffs did not submit any
further records or documents to Clarendon after their claim was
denied. [Docket Item 28-2 ¶ 56.]

### 3. State Farm Policy, Claim, and Denial

State Farm issued a Rental Dwelling Policy – Special Form 3
("State Farm Policy") to Plaintiffs that was in effect from July
1, 2009 to July 1, 2015. [Docket Items 27-4 ¶ 12; 27-3 at 3-33.]
The State Farm Policy was divided into Section I, "Your
Property," and Section II, "Your Liability." [Docket Item 27-3
at 7-33.] Before both sections the policy included a

16

"Definitions" section. [Id. at 8-9.]

Section I included four major subsections: "Coverages,"
"Losses Insured," "Losses Not Insured," and "Conditions." [Id.
at 9-16.] The "Coverages" subsection included five further
subsections: Coverage A covered the "Dwelling," Coverage B,
"Personal Property," Coverage C, "Loss of Rents," the fourth,
"Additional Coverages," and the fifth, "Inflation Coverage."
[Id. at 9-12.]

Section II included four major subsections: "Coverages,"
"Exclusions," "Additional Coverages," and "Conditions." [Id. at
16-21.] The "Coverages" subsection included two further
subsections: Coverage L covered "Business Liability," and
Coverage M, "Premises Medical Payments." [Id. at 16-17.]

The State Farm Policy also contained two further sections
after Sections I and II: the first was "Section I and II –
Conditions," and the second was "Optional Provisions." [Id. at
21-23.]

After those four sections, the State Farm Policy contained
a number of endorsements which changed the policy. [Id. at 24-
33.] They were as follows:

(a)  Amendatory Endorsement – New Jersey [id. at 24];

(b)  Debris Removal Endorsement [id. at 25];

(c)  Lead Poisoning Exclusion Endorsement [id. at 26];

17

(d)   Fungus (Including Mold) Exclusion Endorsement [<u>id.</u> at 27];

(e)   FE-6854 Civil Union Endorsement [<u>id.</u> at 28];

(f)   Fungus (Including Mold) Limited Coverage Endorsement ($10,000) [<u>id.</u> at 29-30];

(g)   FE-5801 Mandatory Reporting Endorsement [<u>id.</u> at 31]; and

(h)   FE-5610 Rental Dwelling Policy Endorsement [<u>id.</u> at 32-33].

The provisions in the State Farm Policy relevant to this action are outlined as follows, in the order in which they appear within the Policy:

<u>Definitions</u>:
. . .
8. "occurrence," when used in Section II of this policy, means an accident, including exposure to conditions, which results in:
      a. bodily injury;
      b. property damage; or
      c. personal injury;
during the policy period. Repeated or continuous exposure to the same general conditions is considered to be one occurrence.
. . .
10. "property damage" means physical damage to or destruction of tangible property, including loss of use of this property. Theft or conversion of property by any insured is not considered to be property damage.
. . .
<u>Section I - Coverages</u>
Coverage A - Dwelling
We cover:
1. the dwelling on the residence premises shown in the

Declarations used principally as a private residence, including structures attached to the dwelling;

2. materials and supplies located on or adjacent to the residence premises for use in the construction, alteration or repair of the dwelling or other structures on the residence premises;

. . .

Except as specifically provided for in the <u>Section I Additional Coverages</u>, for Land, we do not cover land or any costs required to replace, rebuild, stabilize or otherwise restore the land.

. . .

<u>Additional Coverages</u>

. . .

9. Land. We will pay up to $10,000 for the cost required to replace, rebuild, stabilize or otherwise restore the land necessary to support the insured dwelling sustaining a covered loss. This may increase the limit applying to the property.

. . .

<u>Section I – Losses Not Insured</u>

1. We do not insure for loss to the property described in Coverage A and Coverage B either consisting of, or directly and immediately caused by, one or more of the following:

. . .

   i. wear, tear, marring, scratching, deterioration, inherent vice, latent defect and mechanical breakdown;

   j. rust, mold, or wet or dry rot;

   k. contamination;

. . .

<u>Section I – Conditions</u>

. . .

8. Suit Against Us. No action shall be brought unless there has been compliance with the policy provisions and the action is started within one year after the date of loss or damage.

. . .

<u>Section II – Liability Coverages</u>
<u>Coverage L – Business Liability</u>

If a claim is made or a suit is brought against any insured for damages because of bodily injury, personal injury, or property damage to which this coverage applies, caused by an occurrence, and which arises

from the ownership, maintenance, or use of the insured
premises, we will:
1. pay up to our limit of liability for the damages
for which the insured is legally liable; and
2. provide a defense at our expense by counsel of our
choice. We may make any investigation and settle any
claim or suit that we decide is appropriate. Our
obligation to defend any claim or suit ends when the
amount we pay for damages, to effect settlement or
satisfy a judgment resulting from the occurrence,
equals our limit of liability.
. . .
<u>Section II – Exclusions</u>
1. Coverage L – Business Liability and Coverage M –
Premises Medical Payments do not apply to:
. . .

     i. bodily injury or property damage arising out
     of the actual, alleged or threatened discharge
     dispersal, spill, release or escape of
     pollutants:
        (1) at or from premises owned, rented or
        occupied by the named insured;
     . . .
     In addition, Coverage L and Coverage M do not
     apply to loss, cost or expense arising out of any
     governmental direction or request that the named
     insured test for, monitor, clean up, remove,
     contain, treat, detoxify, or neutralize
     pollutants;
     As used in this exclusion:
     . . .
     "pollutants" means any solid, liquid, gaseous or
     thermal irritant or contaminant, including smoke,
     vapor, soot, fumes, acids, alkalis, chemicals and
     waste.
     "waste" includes materials to be recycled,
     reconditioned or reclaimed.
2. Coverage L – Business Liability, does not apply to:
. . .
     b. property damage to property owned by any
insured;
     . . .
     <u>Section II – Conditions</u>
     . . .
6. Suit Against Us. No action shall be brought against
us unless there has been compliance with the policy

provisions.

. . .

8. Other Insurance – Coverage L – Business Liability.
This insurance is excess over any other valid and
collectible insurance except insurance written
specifically to cover as excess over the limits of
liability that apply in this policy.

Section I and Section II – Conditions

1. Policy Period. This policy applies only to loss
under Section I or bodily injury, personal injury, or
property damage under Section II which occurs during
the period this policy is in effect.

. . .

10. Conformity to State Law. When a policy provision
is in conflict with the applicable law of the State in
which this policy is issued, the law of the State will
apply.

. . .

Amendatory Endorsement (New Jersey)

. . .

Section II – Exclusions
The following is added to exclusions 1.i.:
        This exclusion does not apply to pollution which
        occurs quickly and abruptly and is accidental.

[Docket Item 27-3 at 8-24.]

Plaintiffs subsequently submitted a claim to State Farm,

which State Farm denied by letter dated June 19, 2014. [Docket

Item 27-4 ¶¶ 13-14.] State Farm denied the claim because, under

Section I,

    [l]and is not included in property covered under
    Coverage A – Dwelling or Dwelling extension.
    Additional coverage for land requires that fi[r]st a
    loss otherwise insured occurs and then coverage would
    be extended up to $10,000 for the cost to restore the
    land to the extent that it is necessary to support the
    dwelling. Since there has been no covered loss to your
    dwelling, the additional coverage for land does not
    apply. Additionally, under Section I of your policy,
    losses as a result of wear, tear, deterioration, rust
    and contamination are specifically excluded.

21

[Docket Item 27-3 at 37.] State Farm next turned to Section II

of the Policy and denied the claim under that Section because it

covered Plaintiffs

> for claims made against you by third parties for which
> you may be liable which meet our insuring agreement
> with you subject to certain conditions and exclusions.
> There must be damage to third party property, such as
> neighboring property or groundwater, before coverage
> is provided under Section II of your policy. . . .
>
> Please be advised that since there are no claims
> against you for damages by a third party, our insuring
> agreement with you had not been met. Additionally, if
> the insuring agreement had been met, this loss did not
> occur quickly and abruptly and accidentally, therefore
> the pollution exclusions would apply. The loss to the
> tank itself is the result of wear, tear and
> deterioration. Under Section II of your policy, the
> exclusions for owned property and pollution would
> apply.
>
> As stated above, there is no coverage for any first
> party damage. Furthermore, no coverage also applies
> under the Liability section of your policy for any
> third party damage. Since your loss is excluded under
> this section, therefore your claim must be denied.

[Id. at 37-39.]

### 4. Defendants' Expert Report

Plaintiffs have not produced any expert reports in this

action, nor disclosed any expert witnesses. [Docket Item 28-2

¶ 65.] Defendants timely produced an expert report prepared by

Daniel G. Sullivan, P.G. of Roux Associates, Inc., who has

thirty-two years of professional experience in hydrogeology and

the investigation and remediation of sites with contaminated

soil and groundwater. [Id. at ¶¶ 66-67.] Mr. Sullivan's expert

report is included in the evidentiary record before the Court,

wherein he states that he was retained "to evaluate available

data and provide an opinion regarding the timing of the onset of

the contaminant release from an improperly abandoned underground

fuel oil storage tank" at the Property. [Docket Item 27-2 at

108.] At the close of his report, he offers his opinions "with a

reasonable degree of scientific certainty" and states as

follows:

> 2. There is no data or information available that
> would allow me to contest, refute, or contradict [the
> Precision's report's opinion of September 4, 2014]
> that the fuel oil release at the Benjamin townhome is
> more than 20 years old, as of the time the sample was
> collected in August 2014. Based on the available age
> dating analysis by [Precision], the petroleum in the
> sample was released more than 20 years prior to sample
> collection. This means that the age dating analysis
> indicates the fuel oil in Sample HA-17 from the
> Benjamins' residence was released prior to 1994.
>
> 3. The life expectancy of unprotected steel
> underground storage tank systems is generally
> estimated to be between 10 and 20 years. Since the UST
> system at 72 Wynnewood Drive was installed in 1976 or
> 1977, its 20-year useful life would have ended in
> about 1997. This date is consistent with Precision
> Testing Lab's age dating analysis.
>
> 4. The fact that the UST contained about 200 gallons
> of oil when it was pumped out on May 28, 2014
> demonstrates that the release from this UST system was
> not from the UST itself, but was instead from the fuel
> line(s) or fittings going from the UST to the
> townhome. Therefore, once the UST was replaced by the
> aboveground tank in the garage, the UST and its fuel
> lines were no longer pressurized by the furnace's fuel

pump and no longer carried fuel from the UST to the
furnace and/or back to the UST. Once there was no
longer fuel oil traveling through the lines, they were
no longer capable of causing releases of oil (i.e.,
they were empty). Mr. Benjamin has testified that the
aboveground tank in the garage was already in place
and in use when he bought the house in 2004;
therefore, no releases from the fuel lines could have
occurred after his date of purchase in 2004. This date
is also consistent with both Precision Testing Lab's
age dating analysis and the average life expectancy of
residential UST systems.

5. Based on the three lines of evidence described
above . . . , it is my opinion that the release from
the UST system at 72 Wynnewood Drive occurred in the
mid- to late- 1990s. The release from the UST system
ended at the time the UST and its fuel lines were
abandoned (some unknown time prior to 2004).
Therefore, it is my opinion, with a reasonable degree
of scientific certainty, that the release from the UST
at 72 Wynnewood Drive began and ended prior to 2004,
when Mr. Benjamin purchased this townhome.

6. The fact that the UST contained about 200 gallons
of oil when it was pumped out on May 28, 2014
demonstrates that the release from this UST system did
not result from a quick, abrupt, or catastrophic
event. Instead, the presence of significant amounts of
oil and very little water at least ten years after
abandonment indicates a gradual and protracted release
that occurred only during the time period when the UST
system was in operation. There is no evidence of any
continuing releases after 2004.

7. Based on my review of the reports prepared by
Moore's describing the limited area of soil and
groundwater impacted by fuel oil at 72 Wynnewood
Drive, there is no evidence of continued migration of
contaminants after the UST was abandoned at some time
prior to 2004. Soil contamination was limited to a
distance of 35 feet or less from the UST and
groundwater was reportedly only impacted directly
beneath the UST excavation.

[Docket Item 27-2 at 116-17.]

## III. STANDARD OF REVIEW[3]

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. <u>Hunt v. Cromartie</u>,

---

[3] The Court exercises diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). On June 13, 2017, the Court inquired of the parties as to whether diversity jurisdiction exists in this action under 28 U.S.C. § 1332(a) and (c) and asked Defendants to provide their respective states of incorporation and the states of their respective principal places of doing business. [Docket Item 37.] Clarendon's counsel responded that Clarendon is an Illinois corporation with its principal place of business in New York. [Docket Item 38.] State Farm's counsel responded that State Farm is incorporated in Illinois and has its principal place of business in Illinois. [Docket Item 39.] Plaintiffs are citizens of New Jersey. [Docket Item 1-2 at 2.] A review of the evidentiary record suggests that the amount in controversy here exceeds $75,000 [Docket Item 28-5 at 14]; accordingly, the Court exercises diversity jurisdiction although the case was removed here on the basis of federal question jurisdiction and no such federal question remains.

526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184

(3d Cir. 2007). Credibility determinations are not appropriate

for the court to make at the summary judgment stage. Davis v.

Portlines Transportes Maritime Internacional, 16 F.3d 532, 536

n.3 (3d Cir. 1994).

A factual dispute is material when it "might affect the

outcome of the suit under the governing law," and genuine when

"the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson, 477 U.S. at 248. The

non-moving party "'need not match, item for item, each piece of

evidence proffered by the movant,'" but must simply present more

than a "mere scintilla" of evidence on which a jury could

reasonably find for the non-moving party. Boyle v. Cnty. of

Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998)

(quoting Anderson, 477 U.S. at 252).


**IV. ANALYSIS**

Both of Defendants' motions will be analyzed under New

Jersey law because the Property is located in New Jersey. See

Unisys Corp. v. Insurance Co. of North America, 154 N.J. 217,

222-23 (1998) ("in the case of New Jersey sites, New Jersey law

should govern").

Under New Jersey law, a court interpreting an insurance

policy "must enforce the policy as written when its meaning and language is clear and unambiguous. . . . The court should read policy provisions so as to avoid ambiguities, if the plain language of the contract permits. . . . [W]hen a court finds an insurance policy to be clear and unambiguous, the matter may be properly resolved on summary judgment." U.S. Bronze Powders, Inc. v. Commerce and Industry Ins. Co., 259 N.J. Super 109, 115-16 (Law Div. 1992), aff'd, 293 N.J. Super 12 (App. Div. 1996) (internal citations omitted). "[T]he words of an insurance policy are to be given their plain, ordinary meaning." Gibson v. Callaghan, 158 N.J. 662, 670 (1999). "When there is doubt, however, regarding the existence of coverage, that doubt is ordinarily resolved in favor of the insured[,]" Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 179 N.J. 87, 102 (2004), "in order to give effect to the insured's reasonable expectations. This is so even if a 'close reading' might yield a different outcome, or if a 'painstaking' analysis would have alerted the insured that there would be no coverage." Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010).

"Exclusionary clauses are presumptively valid and are enforced if they are specific, plain, clear, prominent, and not contrary to public policy. . . . If the words used in an exclusionary clause are clear and unambiguous, a court should

not engage in a strained construction to support the imposition of liability. . . . [E]xclusions are ordinarily strictly construed against the insurer[.]" Id. at 441-42. "Conversely, clauses that extend coverage are to be viewed broadly and liberally." Gibson, 158 N.J. at 671.

The Third Circuit has stated: "[W]hen the terms of an insurance contract are clear, it is the function of a court to enforce it as written and not make a better contract for either of the parties. Thus, we must not torture the language of a contract to create ambiguity where none exists in order to impose liability, and we must construe the words of an insurance policy so as to adhere to their ordinary meaning." Resolution Trust Corp v. Fidelity and Deposit Co. of Md., 205 F.3d 615, 643 (3d Cir. 2000) (internal citations and quotations omitted).

"Generally, an insured bears the burden of establishing that a claim is within the basic policy terms. The insurer has the burden of establishing application of an exclusion." Cobra Prods., Inc. v. Federal Ins. Co., 317 N.J. Super 392, 401 (App. Div. 1998)(internal citations omitted).


## A. Clarendon

Clarendon argues that there is no genuine dispute of material fact that Clarendon is responsible for any of the

damages claimed by Plaintiffs because its policy does not cover the release of fuel oil from the UST and that no reasonable finder of fact could conclude, on this evidentiary record, that it does. The Court does not agree and will deny Clarendon's motion for summary judgment on Count I (breach of contract).

In the alternative, Clarendon moves for summary judgment as to Plaintiffs' claim of bad faith, Count III, and for an order declaring that the allocation of Plaintiffs' remediation costs be assessed on a pro-rata, time on the risk allocation analysis basis and, for that reason, limit Clarendon's coverage to one-twentieth (1/20) of the covered remediation costs.

Clarendon presents five major reasons why the Clarendon Policy does not provide coverage for the release of fuel oil from the UST. The Court will address these in turn, starting with those arguments relating to Section I of the Clarendon Policy, implicating first party coverage, and then turning to those relating to Section II of the Clarendon Policy, implicating liability coverage.

### 1. Section I: "Land" not covered under Coverage A

Clarendon argues that Coverage A, the subsection within Section I that Plaintiffs must argue is applicable to their claim, in fact does not extend coverage to that claim where Coverage A states:

Coverage A - Dwelling
We cover:
1. The dwelling on the "residence premises" shown in the
Declarations, including structures attached to the
dwelling; and
2. Materials and supplies located on or next to the
"residence premises" used to construct, alter or repair the
dwelling or other structures on the "residence premises."

This coverage does not apply to land, including land on
which the dwelling is located.

Clarendon asserts that this is because the "soil remediation

conducted on the insured premises was the result of damage to

the land. Accordingly, any costs associated with the remediation

of the land and/or soil" would not be covered" under Coverage A

or Section I. [Docket Item 28-1 at 27.]

In response, Plaintiffs argue that they "are not seeking

coverage for the cost of repairing the land. Plaintiffs have not

yet taken any steps to replace, rebuild, stabilize or otherwise

restore the land; rather immediately following the date of

discovery, Plaintiffs hired Moore's . . . to remediate the soil

and groundwater. This policy does not specifically exclude the

remediation of soil and groundwater, and therefore, this cost is

covered." [Docket item 29 at 10.]

The Court cannot agree with Plaintiffs' position. The

provision regarding "land" in Coverage A is not an exclusion,

but rather a limitation on the extent of coverage. Coverage A

clearly and unambiguously states that it covers "the Dwelling,"

structures attached to the dwelling, and nearby materials and
supplies used to construct, alter or repair the dwelling or
those structures. In contrast, Coverage A "does not apply to
land, including land on which the dwelling is located." This
language sets a boundary on the extent of Coverage A; it does
not purport to exclude certain costs or damages incurred (e.g.,
the cost of replacing, rebuilding or restoring land, rather than
soil remediation). Whether Section I of the Clarendon Policy
specifically excludes soil remediation is of no moment, when it
expressly "does not apply to land" and there is no dispute of
fact that the injury suffered by Plaintiffs was to the land and
not to the dwelling or related structures or materials.
Furthermore, the factual record suggests that Plaintiffs did
"take[] steps to replace . . . or otherwise restore the land,"
inasmuch as over two hundred tons of contaminated soil were
removed from the Property and replaced with clean fill. [Docket
Item 28-5 at 10-11.]

For that reason, the Court agrees with Clarendon that
Coverage A of the Clarendon Policy does not apply to the damages
suffered by Plaintiffs. As no other coverages in Section I would
apply to Plaintiffs' claim, the Court accordingly finds that
Section I of the Clarendon Policy does not provide first party
coverage for Plaintiffs' claim as a matter of law.

Accordingly, because the Court finds that Coverage A does not apply to Plaintiffs' claim, the Court need not address whether Coverage A's exclusion for "actions undertaken in compliance with law or ordinance" is applicable. [Docket Items 28-1 at 27; 29 at 11.]

The Court will grant partial summary judgment in Clarendon's favor, determining that Plaintiffs are not entitled to recover a first party claim under Section I, Coverage A of the Clarendon Policy. However, the finding that the Clarendon Policy did not provide first party coverage for Plaintiffs' claim does not mandate full summary judgment to Clarendon. The Court next turns to the liability coverage portion of the Policy under Section II.

## 2. Section II: "Occurrence" during the policy period

Clarendon states that Coverage E, the relevant coverage subsection of Section II of the Clarendon Policy, does not apply to Plaintiffs' claim because it applies only to claims or suits for bodily injury or property damage caused by an "occurrence." An "occurrence" is defined within the Clarendon Policy as "an accident, including continuous and repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in a) bodily injury; or b) property damage[,]" meaning "physical injury to, destruction of,

or loss of use of tangible property." Clarendon argues that Plaintiffs' claim was not for an "occurrence" within the meaning of Coverage E because "the age of the release" of the fuel oil was greater than 20 years old as of 2014 and must have occurred prior to the time that Mr. Benjamin purchased the Property in 2004: "Accordingly, there could have been no occurrence during the policy period that resulted in property damage, and therefore, no coverage under the Clarendon Policy incepting on January 1, 2005." [Docket Item 28-1 at 26-27.] However, the Court does not agree.

The Court reads the definition of "occurrence" within the Clarendon Policy as follows: "an accident . . . which results, during the policy period, . . . in property damage." The modifying phrase "during the policy period" appears, to the Court, to modify the second part of that definition, rather than the first. In other words, the Court reads the definition not to state that, in order to qualify as an occurrence, the accident must happen during the policy period, but rather that, in order to qualify as an occurrence, the results of the accident must happen during the policy period. See Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 61-62 (3d Cir. 1982) ("We hold that the determination of when an occurrence happens must be made by reference to the time when the injurious effects of

the occurrence took place. There can be no question but that the aspect of the occurrence which must take place within the policy period is the 'result,' that is, the time when the accident or injurious exposure produces . . . injury") (internal citations omitted).

The Third Circuit, applying similar language, has held that, in a case where the "injurious effects" of an event (there, the adoption of discriminatory employment policies) "began immediately . . . and continued at least to some extent into the period of coverage" provided by the insurance policy, "the occurrence takes place when the injuries first manifest themselves." Id. at 62. See also Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 452, 456, 478-79 (1994) (describing as "well settled" the "general rule" that "the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time when the complaining party is actually damaged"). In Appalachian, the Third Circuit ruled that the injuries to the employees occurred immediately upon the adoption of the policies, before the effective date of the insurance policy, noting that a "contrary result in this case would contravene the rule that an insured cannot insure against something which has already begun. The rule is based on the realization that the

purpose of insurance is to protect insureds against unknown risks." Appalachian, 676 F.2d at 63. The court found that "the risk of liability was no longer unknown" on the policy's effective date "because injuries resulted immediately[,]" i.e., before that date, and because "the complaint to the EEOC preceded the effective date" of the policy. Id. Although some injured employees "did not begin their employment" until after the effective date of the policy, the court found that immaterial: "Once we established there was but one occurrence it either took place before or after the effective date of the policy"--otherwise, there would have to have been multiple occurrences. Id. at 63 n.17.

This Court was confronted with a similar situation in UTI Corp. v. Fireman's Fund Ins. Co., 896 F. Supp. 362, 383 (D.N.J. 1995), where the Court stated: "The policies do not tell us that it is the toxic leak which, in the pollution context, triggers coverage; the policies tell us only that coverage is triggered by an accident or continuous or repeated exposure to conditions which results in (bodily injury or) 'property damage' during the term of the policy. If 'property damage' occurred after the date of the last leak of TCE from the USTs, there could conceivably be coverage under the policies." In UTI Corp., this Court looked to the earlier case of Chemical Leaman Tank Lines v. Aetna Cas.

& Sur. Co., 817 F. Supp. 1136, 1153-54 (D.N.J. 1993), wherein
that court "predicted that the New Jersey Supreme Court would
apply, as a matter of law, the 'continuous trigger' theory of
coverage for pollution claims[.]" UTI Corp., 896 F. Supp. at
383. If that were the case, such a holding would have allowed
the plaintiff in UTI Corp. to "recover under each policy in
force from the date the insured began operating . . . its plant
through the date the resulting soil and groundwater
contamination damage manifested itself"; therefore, the Court
stated, the "policies would thus be continuously triggered if
the insured could show (1) that some kind of property damage
occurred during each policy period for which the insured seeks
coverage, and (2) that the property damage was part of a
continuous and indivisible process of injury." Id. at 383.

In fact, the New Jersey Supreme Court did subsequently
apply the "continuous trigger" theory of coverage for pollution
claims, and Chemical Leaman was affirmed on this ground. See
Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co., 89
F.3d 976, 995 (3d Cir. 1996) (citing Owens-Illinois, 138 N.J. at
455). "Under the continuous trigger theory, exposure to the harm
causing agent is sufficient to trigger potential coverage.
Actual manifestation of the injury is not required, so long as
there is a continuous, indivisible process resulting in damage.

. . . The jury could find property damage occurred during a policy period so long as there is proof that a continuous, indivisible process of injury occurred during that period."
Chemical Leaman, 89 F.3d at 995-96.

The undisputed evidence in this case tends to show, in the Court's view, only when the leak began and ended (at some point in the mid- to late-1990s, and at some undetermined point before 2004, respectively). If, as was seen by the Court as possible in UTI Corp., "property damage occurred after the date of the last leak," "there could conceivably be coverage" under the Clarendon Policy. The Court finds that there remains a genuine dispute of material fact as to when the property damage, rather than the leak, occurred, and therefore, the date of the "occurrence" under the policy.

Accordingly, the Court declines to adopt Clarendon's proposed interpretation seeking a determination, as a matter of law, that there was no "occurrence," within the meaning of the Clarendon Policy, during the policy period.

### 3. Section II: Pollution Exclusion

Clarendon next argues that the pollution exclusion endorsement within the Policy under the heading "Amendatory Endorsement - New Jersey" excludes Plaintiffs' claim from coverage. The Court does not agree.

Under "Section II - Exclusions," Item 2 states that

"Coverage E - Personal Liability does not apply to" a number of

claims. The Amendatory Endorsement adds "exclusion g." to Item 2

as follows:

> g. A loss caused by dumping, discharge or escape of
> irritants, pollutants or contaminants. Any loss, cost or
> expense arising out of any governmental direction or
> request that <u>you</u> test for pollutants. Any loss, cost or
> expense arising out of any governmental direction or
> request that <u>you</u> watch for pollutants. Any loss, cost or
> expense arising out of any governmental direction or
> request that <u>you</u> clean up or remove pollutants. Any loss,
> cost or expense arising out of any governmental direction
> or request that <u>you</u> control or treat pollutants. Any loss,
> cost or expense arising out of any governmental direction
> or request that <u>you</u> detoxify or neutralize pollutants.
> A pollutant is any solid or liquid irritant or contaminant.
>
> A pollutant is also any gaseous or thermal irritant or
> contaminant. A pollutant can be smoke, vapor, soot, fumes,
> acids, alkalis, chemicals and waste. The definition of
> waste includes materials that can be recycled,
> reconditioned or reclaimed.
>
> These exclusions are not valid if the loss was sudden and
> accidental.

Clarendon argues that this exclusion applies to Plaintiffs'

claim, and that the loss was not "sudden and accidental" under

New Jersey law. Accordingly, it urges that the Court find that

exclusion g. be found applicable, rendering Plaintiffs' claim

not covered under Coverage E. [Docket Item 28-1 at 28-30.]

The Court finds instructive the Third Circuit's explanation

of the treatment of pollution exclusion clauses under New Jersey

law:

> [T]he New Jersey Supreme Court addressed the standard
> form pollution exclusion clause in <u>Morton Int'l, Inc.</u>
> <u>v. General Accident Ins. Co. of America</u>, [134 N.J. 1,
> 28-31 (1993).] . . . It held "'sudden' possesses a
> temporal element, generally connoting an event that
> begins abruptly or without prior notice or warning"
> and concluded that "the phrase 'sudden and accidental'
> in the standard pollution-exclusion clause describes
> only those discharges, dispersals, releases, and
> escapes of pollutants that occur abruptly or
> unexpectedly and are unintended." Nevertheless, the
> court refused to enforce the standard pollution
> exclusion as written because it found the insurance
> industry had misled state regulators in securing its
> approval. Instead, the court held the pollution
> exclusion clause precludes coverage if the insured
> intentionally discharges a known pollutant, regardless
> of whether the insured expected or intended to cause
> property damage[.] . . . ["]Accordingly, we construe
> and give effect to the standard pollution-exclusion
> clause only to the extent that it shall preclude
> coverage for pollution-caused property damage caused
> by an 'occurrence' if the <u>insured</u> intentionally
> discharged, dispersed, released, or caused the escape
> of a known pollutant."

<u>Chemical Leaman</u>, 89 F.3d at 990-91 (quoting <u>Morton</u>, 134 N.J. at 29, 31 (emphasis in original)). In <u>Chemical Leaman</u>, the insurer argued that Morton's regulatory estoppel-based holding shouldn't apply to its policy because its policies contained non-standard pollution exclusions and "because it was not party to the misrepresentations made to regulatory authorities." <u>Chemical Leaman</u>, 89 F.3d at 991. The Third Circuit rejected that argument, stating: "We do not believe the New Jersey Supreme Court would enforce the term 'sudden' in non-standard pollution exclusion clauses simply because other language in those clauses

varies slightly from that in the standard pollution exclusion"
and enforced <u>Morton</u>'s regulatory estoppel holding; the court
also found that the insurer "benefitted from the misleading
explanation of the effect of the standard pollution exclusion
submitted to state regulators by insurance industry trade
groups" and believed that "the New Jersey Supreme Court would
not enforce the term 'sudden' in the policies issued by the"
insurer. <u>Id.</u> at 991-92.

The Appellate Division, interpreting <u>Morton</u>, stated as
follows: "Unless the insurer establishes that the insured
intentionally discharged a known pollutant or had specifically
authorized an agent to act for it in intentionally discharging a
known pollutant, the pollution exclusion clause will not bar
coverage." <u>J. Josephson, Inc. v. Crum & Forster Ins. Co.</u>, 293
N.J. Super. 170, 200 (App. Div. 1996). This is so even though
"the phrase 'sudden and accidental' related not to the damage
caused by the pollution, but only to the 'discharge, dispersal,
release or escape' of pollutants for which coverage was
provided." <u>Id.</u> at 191 (citing <u>Morton</u>, 134 N.J. at 28-29).

The New Jersey Supreme Court reexamined pollution
exclusions in <u>Nav-Its, Inc. v. Selective Ins. Co. of America</u>,
183 N.J. 110 (2005). There, the court looked at both the
standard pollution exclusion discussed in <u>Morton</u> as well as "a

new pollution exclusion, first appearing in 1985, and commonly known as the absolute exclusion clause." Two differences between the standard exclusion and the absolute exclusion "were the elimination of the reference to an exception for the sudden and accidental release of pollution, and the elimination of the requirement that the pollution be discharged into or upon land, the atmosphere or any watercourse or body of water." Nav-Its, 183 N.J. at 121-22. The court concluded that "the pollution-exclusion clause in its various forms demonstrates that its purpose was to have a broad exclusion for traditional environmentally related damages." Id. at 123. In holding that the exclusion did not apply to a case about paint or sealant fumes causing personal injury, the court ruled that "the scope of the pollution exclusion should be limited to injury or property damage arising from activity commonly thought of as traditional environmental pollution" and that the exclusion "should be limited to traditional environmental pollution." Id. at 124, 126. The court cited with approval the following observation: "'The drafters' utilization of environmental law terms of art ("discharge," "dispersal," . . . "release" or "escape" of pollutants) reflects the exclusion's historical objective--avoidance of liability for environmental catastrophe related to intentional industrial pollution.'" Id. at 124

(citing Motorists Mut. Ins. Co. v. RSJ, Inc., 926 S.W.2d, 679, 681 (Ky. Ct. App. 1996)).

Since Nav-Its, other courts have examined various situations to determine whether they constitute "traditional environmental pollution," and, therefore, whether pollution exclusions should be found applicable.

This Court, in finding a pollution exclusion inapplicable to mercury contamination inside a building later used as a daycare center, examined Morton and Nav-Its, stating: "The Nav-Its court does not provide much specific guidance on the meaning of 'traditional environmental pollution,' beyond the observation that the exclusion was intended to avoid liability for 'environmental catastrophe related to intentional industrial pollution.' [Nav-Its, 183 N.J. at 124, citing Motorists, 926 S.W.2d at 681] . . . [S]ee Merchants Ins. Co. of N.H., Inc. v. Hessler, No. 03-5857, 2005 WL 2009902, at *3 (D.N.J. Aug. 18, 2005) ('Traditional environmental pollution was defined . . . as '"environmental catastrophe related to intentional industrial pollution."')." Baughman v. U.S. Liability Ins. Co., 662 F. Supp. 2d 386, 397 (D.N.J. 2009). In Baughman, this Court found that the pollution exclusion did not apply to cases where "toxins [were] released in a contained space," but found that "the mere presence of contaminant outdoors is not necessarily

42

sufficient" to establish a situation involving "traditional environmental pollution" and therefore, one in which a pollution exclusion may be applicable. 662 F. Supp. 2d at 397, 398.

In Merchants Ins. Co. of N.H., cited by the Court in Baughman, the court found that the activity that the insurer proposed was excluded by the pollution exclusion did not constitute "traditional environmental pollution" even where the insured "was requested by the health department to remediate the lead paint chips by removing the top layer of soil off the property and laying down fresh soil[,]" because "the act of removing the top layer of soil does not constitute an 'environmental catastrophe related to intentional industrial pollution.' [Nav-Its, 183 N.J.] at 124[.] Therefore, the total pollution exclusion endorsement does not apply in this case." 2005 WL 2009902, at *3.

More recently, a court has reiterated that pollution exclusions (even "Absolute Pollution Exclusions") "only apply to intentional pollution," and denied summary judgment where the insured was "a 'mom & pop contracting business attempting to fill a mined-out sand pit to grade[,]' . . . the materials it left on its site 'seemed innocuous at the time[,]' . . . '[t]here [was] no intentional pollution[, and]' the pollution level was too low to constitute 'catastrophe[,]'" but it was

undisputed that the insured "used the [site] as a disposal site
for a variety of waste materials from local construction sites,"
the NJDEP investigated the site repeatedly, the site was tested
for contaminants under the direction of the E.P.A., and the
NJDEP identified the insured "as the sole party responsible for
the contamination at the site." Castoro v. Hartford Accident and
Indemnity Co., Inc., No. 14-1305, 2016 WL 5660438, at *7, *3, *2
(D.N.J. Sept. 29, 2016). The court ruled that, pursuant to Nav-
Its, "even when a pollution exclusion's language does not
require intent, New Jersey public policy requires intent to
avoid unregulated and sweeping elimination of pollution-caused
damage coverage. . . . Due to this intent requirement,
[comprehensive general liability] policies that attempt to
exclude all pollution damage actually 'include[ ] coverage for
continuous or repeated exposure to conditions, provided that the
property damage -- not the discharge – was "neither expected nor
intended from the standpoint of the insured."'" [Morton, 134
N.J. at 29]; see also Nav-Its, [183 N.J. at 124] (applying the
intent requirement in Morton, even though the absolute pollution
exclusion in Morton was expressly limited to 'sudden' and
'accidental' injuries, unlike the pollution exclusion in Nav-
Its)." Castoro, 2016 WL 5660438, at *7. The court stated that
the insurer "failed to demonstrate that there is no genuine

44

dispute of material fact that would satisfy New Jersey's intent requirement" because the insurer failed "to allege that Plaintiff intentionally polluted" the site and the insured contended that "its polluting conduct was unintentional because the 'materials seemed innocuous at the time.'" Id.

If the court in Castoro can find that there is a genuine issue of material fact as to whether a pollution exclusion should apply under Morton and Nav-Its, where the situation much more greatly resembles, in the Court's opinion, "traditional environmental pollution," the Court here finds that such an analysis only applies with greater strength to the present facts. Here, Plaintiffs had no part in the release of the heating oil; nor can knowledge (or reason to know or suspect) thereof be imputed to them at the time they bought the Clarendon Policy.

Given the applicability of the pollution exclusion only in a context involving "traditional environmental pollution" under Nav-Its and the failure of Clarendon to allege (let alone demonstrate the existence of evidence from which a reasonable fact-finder could find) that Plaintiffs intended to pollute the Property, the Court declines to grant summary judgment at this time on the grounds that the Pollution Exclusion applies under Coverage E.

## 4. Section II: Owned Property Exclusion

Clarendon argues that the "owned property" exclusion contained in "Section II - Exclusions" applies to Plaintiffs' claim and bars their recovery for the costs of the remediation. [Docket Item 28-1 at 30-34.] In response, Plaintiffs argue that there is a "genuine issue of material fact regarding the effects of the damaged groundwater on third parties," that the soil remediation and groundwater remediation should be viewed as a unit because they "were made necessary by the same damage," and that the property of third parties would have suffered imminent damage had the Plaintiffs not undertaken the remediation efforts. [Docket Item 29 at 10.] Clarendon notes in reply that Plaintiffs do "not cite to a single document, statement, report or opinion contained in the record" to support the proposition that there was an imminent threat to the property of third parties. [Docket Item 36 at 7.]

The relevant exclusion states as follows:

Section II - Exclusions
1. Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to "bodily injury" or "property damage":
   . . .
     c. Arising out of the rental or holding for rental of any part of any premises by an "insured." This exclusion does not apply to the rental or holding for rental of an "insured location":
         (1) On an occasional basis if used only as a residence;
         (2) In part for use only as a residence, unless a

single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or
(3) In part, as an office, school, studio or private garage;

. . .

2. Coverage E - Personal Liability, does not apply to:

. . .

b. "Property damage" to property owned by the "insured"[.]

Under New Jersey law, the owned property exclusion has been found to exclude indemnification where there was only a threat of damage to the property of a third party and no actual damage manifested. State v. Signo Trading Int'l, 130 N.J. 51, 65 (1992). While the trial court there made a finding that potential contamination to the property of third parties was imminent, the New Jersey Supreme Court nevertheless found that the "policy's definition of property damage does not encompass 'threatened harm' even if that threat is 'imminent' and 'immediate.' Thus, under its clear terms, the policy does not cover the costs of cleanup performed by or on behalf of an insured on its own property when those costs are incurred to alleviate damage to the insured's own property and not to the property of a third party." Id. at 62-63. The Signo court distinguished both cases that "fall within the narrow exception allowing recovery for the cost of measures intended to prevent imminent or immediate future damage when a present injury has already been demonstrated," citing Western World Ins. Co. v.

<u>Dana</u>, 765 F. Supp. 1011 (E.D. Cal. 1991), and cases where expenses had been incurred to remedy groundwater, which under the relevant state law, constituted not "damage to property of the occupier of the land, but rather" "damage to the property of third persons," citing <u>Intel Corp. v. Hartford Accid. & Indem.</u> <u>Co.</u>, 952 F.2d 1551 (9th Cir. 1991).

Subsequent New Jersey case law has held that "groundwater does not clearly fall within the category of 'owned property' for the purposes of the exclusion[,]" because "groundwater is unique. Unlike other property that is normally considered as being within the four corners of one's deed, groundwater not only flows or trickles or runs or oozes through the land from one place to another, but, other than being a source of potable water, it is certainly not susceptible to the custody or control of a property owner. To this extent, we agree with the description in <u>UMC[/Stamford v. Allianz Underwriters Ins. Co.</u>, 276 N.J. Super. 52, 61 (Law Div. 1994)] that it is by its very nature, a migratory fluid which uncontrollably seeps through porous soil particles which is nearly impossible to naturally contain[.]" <u>Morrone v. Harleysville Mut. Ins. Co.</u>, 283 N.J. Super. 411, 420 (App. Div. 1995) (internal citations and quotations omitted).

As this Court stated in <u>Federal Ins. Co. By and Through</u>

48

_Assoc. Aviation Underwriters v. Purex Industries, Inc._,: "New Jersey courts have held that groundwater below real property is not owned by the property owner. This proposition of law is upheld and supported by a series of eight opinions issued by the appellate division [in 1996, applying _Morrone_]." 972 F. Supp. 872, 883 (D.N.J. 1997). Although the defendants in _Purex_ claimed that _Morrone_ was "ill-considered" and that the New Jersey Supreme Court would "most likely reverse the appellate division decisions in whole or in part," the Court did "not share that view": "_Morrone_ does not contradict any New Jersey Supreme Court precedent, including [_Signo_], and has not itself been overruled or distinguished." _Purex_ at 883-84.

_Purex_ continues that, although _Morrone_ itself dealt with a "duty to defend" context and not a claim for indemnification of remediation of groundwater, "[t]he appellate division cases which follow _Morrone_ . . . apply to a variety of contexts, including those for indemnification of remediation costs." _Id._ at 884. The Court found, as a matter of law, that "the owned property exclusion does not apply to remediation of contaminated groundwater." _Id._

The Court notes that, twenty years later, _Morrone_ still has not been overruled or distinguished by the New Jersey Supreme Court. Indeed, the Appellate Division has squared any apparent

tension between Morrone and Signo: "Under the law, groundwater

is not considered property owned by the insured. [Morrone, 283

N.J. Super. at 420.] Therefore, groundwater contamination is not

excluded under the owned property exclusion, Kentopp v. Franklin

Mut. Ins. Co., 293 N.J. Super. 66, 77 (App. Div. 1996), and

groundwater remediation costs are considered property damage.

Morton, 124 N.J. at 27 . . . On the other hand, a mere threat of

future groundwater contamination is insufficient to establish

property damage. [Signo, 130 N.J. at 63-64.]" Mid-Monmouth

Realty Assocs. v. Metallurgical Industries, Inc., No. L-2422-00,

2017 WL 1422848, at *9 (App. Div. N.J. Sup. Ct. Apr. 21, 2017).[4]

Clarendon urges the Court to take note of the divide

"between the extensive soil remediation effort and the very

limited groundwater remediation" as well as the alleged paucity

of evidence showing either immediate or imminent harm to

neighboring third parties, and conclude that there is no genuine

dispute of material fact in this evidentiary record showing that

_____

[4] Clarendon cites the Law Division case UMC/Stamford, 276 N.J.
Super. at 62, for the proposition that "coverage should not be
barred" only if a plaintiff proves "the actual existence of
pollutants in the groundwater as well as a substantial risk that
a third-party's property will be contaminated." [Docket Item 28-
1 at 31.] To the extent that this constitutes an additional
required showing, the Court finds that Morrone (which expressly
cited and addressed UMC/Stamford) and its progeny, including
Mid-Monmouth Realty, which do not require any such additional
showing, overrule this case, and that the New Jersey Supreme
Court would not impose such an additional requirement.

the owned property exclusion is inapplicable. [Docket Item 28-1 at 32.] The Court disagrees. The evidentiary record clearly shows that groundwater was in fact contaminated and was remediated; accordingly, under New Jersey law, the evidentiary record demonstrates injury to third parties, and such injury (i.e., to the common groundwater) in fact occurred, and was not merely threatened or imminent. The owned property exclusion does not apply to groundwater.

Clarendon asks the Court, in the alternative, to apply the owned property exclusion "to the costs for remediation of the soil contamination when those costs are not 'reasonably associated with remediating groundwater.'" [Docket Item 28-1 at 33, citing Purex, 972 F. Supp. at 884 (internal citations omitted).]

In Purex, the defendants asked the court to apply the owned property exclusion to the costs of soil remediation as unrelated to groundwater contamination on the basis that "'other costs associated with remediating the site--for example soil excavation, and fill and tank removal--should not be considered covered damages except to the extent that they are deemed costs reasonably associated with groundwater remediation. The soil and tanks were clearly "owned property."'" Purex, 972 F. Supp. at 884 (citing Strnad v. North River Ins. Co., 292 N.J. Super 476,

482 (App. Div. 1996)). However, the plaintiff in Purex countered that "soil remediation was necessary to prevent further damage to groundwater," citing F.K. Smidth & Co. v. The Travelers Ins. Co., 292 N.J. Super 483, 489 (App. Div. 1996) for the proposition that "the costs of remediating the soil pollution causing the groundwater contamination may be covered." The court agreed that the plaintiff had presented evidence that the "soil contamination [at issue] was identified as the source of groundwater contamination" and found that the insurers "failed to present evidence that any of the remediation costs . . . , including those costs incurred for soil remediation, . . . are not costs 'reasonably associated with remediating groundwater.' Sagendorf v. Selective Ins. Co., 293 N.J. Super 81, 98 (App. Div. 1996)[.]" Purex, 972 F. Supp. at 884.

In Purex, the court in fact granted summary judgment to the insured on the claim that the owned property exclusion did not apply to the costs of soil remediation, because the insurers did not raise a genuine dispute of material fact that such costs were not reasonably associated with remediating the groundwater. Id. at 884-85. Here, the Court will simply find that there does exist a genuine issue of material fact as to which of Plaintiffs' asserted soil remediation and associated costs were "reasonably associated with remediating groundwater." See also

Universal-Rundle Corp. v. Commercial Union Ins. Co., 319 N.J.
Super. 223, 241 (App. Div. 1999) (allowing insurer "to present
evidence of the proper allocation of remediation expenses
between soil and groundwater cleanup" at trial). Accordingly,
the Court will deny Clarendon's motion for summary judgment on
the basis of the owned property exclusion.

### 5. Pro-Rata, Time on the Risk Allocation

Clarendon argues that "New Jersey case law dictates that
the allocation of remediation costs must be assessed on a pro-
rata, time on the risk allocation analysis." [Docket Item 28-1
at 34, citing Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J.
312, 326 (1998).] Plaintiff does not contest this argument, and
the Court finds it well-founded. See also Quincy Mut. Fire Ins.
Co. v. Borough of Bellmawr, 172 N.J. 409, 435-36 (2002)("'[A]
fairer method of allocation appears to be one that is related to
both the time on the risk and the degree of risk assumed'" and
that a "'better formula' would allocate the 'losses among the
carriers on the basis of the extent of the risk assumed, i.e.,
proration on the basis of policy limits, multiplied by years of
coverage.'") (citing Owens-Illinois, 138 N.J. at 479, 475).

Clarendon urges that, under this analysis, because the leak
was likely to have commenced as early as 1994, and Clarendon
only insured the Property for one year between 1994 and 2014

when the remediation was performed, Clarendon's potential

coverage liability should be limited to 1/20 of the total

covered remediation costs. [Docket Item 28-1 at 36.]

The Court is not persuaded that this is an accurate

implementation of the Carter-Wallace/Owens-Illinois analysis.

Plaintiffs' ownership of the Property began in January of 2004

(the Court will use months for simplification purposes) and

ended after approximately half of 2015. Arguably, the damage to

Plaintiffs ended at roughly the same time, in May of 2015 when

the NJDEP issued the No Further Action letter.

The Court finds that Plaintiffs' damages occurred beginning

in 2004, when their exposure to the harm (namely, contamination

in the Property and the groundwater beneath) began, and not in

1994, when Plaintiffs were not damaged by the fuel oil below 72

Wynnewood Drive. Those damages continued, arguably, for the

period from January of 2004 until May of 2015.

Clarendon provided insurance for one of those years under

Coverage E for $300,000 and in total for $569,200. [Docket Item

28-5 at 48.] In contrast, State Farm insured the Property for

six of those 11.5 years for $852,930 plus the actual loss of

rents, with the business liability component of that coverage

constituting $600,000 annually--at least, those were the

coverage amounts for the State Farm Policy from 2013 to 2014.

[Docket Item 27-3 at 4.] It is not known which insurer insured
the Property for the remaining four and a half years, although
Plaintiffs and Defendants appear to agree that "the Benjamins
maintained insurance coverage on the home for the entire time of
their ownership." [Docket Item 28-1 at 35.]

The Court agrees that an allocation prorating on the basis
of policy limits multiplied by time on the risk is appropriate
in this case. However, there are disputes of material fact as to
the appropriate allocation of the costs of remediation, due to
the uncertainty of the record at this juncture of the policy
limits for the relevant times as allocated among Defendants, as
well as other insurers on the risk during this eleven-year
period. The Court will therefore deny Clarendon's motion to the
extent that it asks the Court to determine, as a matter of law,
that Clarendon is responsible for no more than 1/20 of those
costs.

### 6. Bad Faith Claim

Finally, Clarendon seeks summary judgment on Plaintiffs'
claim of bad faith in Count III of the Complaint. [Docket Item
28-1 at 36-37, citing Docket Item 1-2 at 7-8.]

Under New Jersey law, "to show a claim for bad faith, a
plaintiff must show the absence of a reasonable basis for
denying benefits of the policy and the defendant's knowledge or

reckless disregard of the lack of a reasonable basis for denying the claim"; "if a claim is fairly debatable, no liability" for bad faith will arise. Pickett v. Lloyd's, 131 N.J. 457, 473 (1993) (internal citations omitted). "Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." Id. Unreasonable delay in processing a claim can also serve as the basis of a bad-faith claim. Id. at 474.

In their Response, Plaintiffs do not contest Clarendon's argument that they have failed to show that Clarendon's position was not "fairly debatable." [Docket Item 29.] Accordingly, "the Court deems the issue conceded." Moorestown Tp. Bd. of Educ. v. S.D., 811 F. Supp. 2d 1057, 1085 (D.N.J. 2011). The Court agrees that Plaintiffs have not met their burden of establishing that Clarendon's position with regard to denying their claim was not fairly debatable. For that reason, the Court will grant Clarendon's motion for summary judgment as to Plaintiffs' claim of bad faith in Count III with regard to Clarendon.

**B. State Farm**

The Court next turns to State Farm's Motion for Summary

Judgment. State Farm makes many of the same arguments as Clarendon; where appropriate, the Court will refer to the relevant discussion <u>supra</u>.

State Farm asserts four major arguments in support of its motion for summary judgment: first, that there was no "occurrence" within the policy period under Section II; second, that the pollution exclusion in Section II excludes Plaintiffs' claim from coverage; third, that Section I does not cover Plaintiffs' claim for three separate reasons; and fourth, in the alternative, that Plaintiffs have not met their burden to demonstrate bad faith and that summary judgment should be granted to State Farm as to that claim.

The Court will first address the arguments made as to Section I of the State Farm Policy, and then turn to Section II.

## 1. Section I: "Land" not covered

State Farm argues that there is no first party coverage under Section I of the State Farm Policy because by its terms, and subject only to one irrelevant exception, the Policy does not cover land. [Docket Item 27-1 at 21.] The Court agrees.

The relevant portion of Section I of the State Farm Policy provides as follows:

Section I – Coverages
Coverage A – Dwelling
We cover:
1. the dwelling on the residence premises shown in the

57

> Declarations used principally as a private residence,
> including structures attached to the dwelling;
> 2. materials and supplies located on or adjacent to
> the residence premises for use in the construction,
> alteration or repair of the dwelling or other
> structures on the residence premises;
> . . .
> Except as specifically provided for in the <u>Section I
> Additional Coverages</u>, for Land, we do not cover land
> or any costs required to replace, rebuild, stabilize
> or otherwise restore the land.
> . . .
> <u>Additional Coverages</u>
> . . .
> 9. Land. We will pay up to $10,000 for the cost
> required to replace, rebuild, stabilize or otherwise
> restore the land necessary to support the insured
> dwelling sustaining a covered loss. This may increase
> the limit applying to the property.

[Docket Item 27-3 at 9-11.] None of the other Coverage

subsections in Section I would be relevant to Plaintiffs' claims

except Coverage A.

Coverage A, by its terms, covers only the dwelling,

structures attached to the dwelling, and adjacent materials and

supplies for use in the construction, alteration, or repair of

those structures or the dwelling. Furthermore, Coverage A

specifically withholds coverage for land or any costs required

to replace, rebuild, stabilize or otherwise restore the land. As

above, <u>see</u> <u>supra</u> at IV.A.1., the Court finds that there is no

genuine dispute of material fact as to whether this withholding

of coverage encompasses the costs of remediation incurred by

Plaintiffs to remove the heating oil from the soil and

58

groundwater on the Property. The Court further finds that the Additional Coverages provision with regard to land is inapplicable, as there is no claim here that "the insured dwelling sustain[ed] a covered loss" to render that remediation "necessary."

Accordingly, as with the Clarendon Policy, see supra at IV.A.1., the Court finds that there is no first party coverage under Coverage A. Because this is the only applicable coverage provision in Section I, the Court need not address State Farm's other contentions that Section I does not cover the claim because its "coverage provisions expressly exclude coverage for damage consisting of or caused by 'contamination,'" [Docket Item 27-1 at 21, citing Docket Item 27-3 at 13] or because Section I "'applies only to loss . . . which occurs during the period this policy is in effect.'" [Docket Item 27-1 at 21, citing Docket Item 27-3 at 21.] Partial summary judgment will be granted in favor of State Farm upon Plaintiffs' claim for Section I, Coverage A coverage.

However, as with Clarendon, see supra IV.A.1., the finding that the State Farm Policy did not provide first party coverage to Plaintiffs' claim does not mandate summary judgment to State Farm. The Court next turns to the liability coverage portion of the Policy under Section II.

**2. Section II: "Occurrence" during the policy period**

State Farm argues that Plaintiffs' claim is not covered because "to trigger liability coverage under the policy, there must be an 'occurrence' during the period the policy is in effect." [Docket Item 27-1 at 16.] According to State Farm, its policy defines "**occurrence**" under Section II as "an accident, including exposure to conditions, which results in: a. **bodily injury**; b. **property damage**; or c. **personal injury**; during the policy period. Repeated or continuous exposure to the same general conditions is considered to be one **occurrence**." [Docket Item 27-3 at 9 (emphasis in original).] State Farm also notes that the "'Conditions' section of the policy also makes clear that the policy applies only to damage 'which occurs during the period this policy is in effect.'" [Docket Item 27-1 at 16, citing Docket Item 27-3 at 21.] State Farm argues that because "there is no evidence of any oil release after 2009" and "there was no oil release during the period of State Farm's insurance," it is not responsible for paying Plaintiffs' claim. [Docket Item 27-1 at 16.]

The Court disagrees. First, as a matter of the language of the Policy, the Court finds that the "Conditions" section of the Policy in fact states: "This policy applies only to . . . property damage under Section II which occurs during the period

this policy is in effect." [Docket Item 27-3 at 21 (emphasis added).] Such language is reasonably clear, and in fact, unambiguous, that what must occur during the policy period is not the act that causes the damage but rather the damage itself. As such, where there is at least a genuine dispute of material fact as to the property damage encompassing not just the initial leak but also the subsequent spread of heating oil throughout the Property's soil and the groundwater beneath, State Farm cannot be entitled to summary judgment where the evidence only shows the timing of the release from the UST.

    To the extent that the language of Coverage L conflicts with this reading, the Court finds it ambiguous. The phrasing of the definition of "occurrence" defines it as "an accident, . . . which results in . . . property damage; . . . during the policy period." [Docket Item 27-3 at 9.] The modifying phrase "during the policy period" could perhaps be read to modify the phrase "an accident"; however, it is equally susceptible of an interpretation which reads it to modify the phrase "which results in property damage." The Court finds that such a phrasing is ambiguous: in Coverage L, "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247 (1979).

Furthermore, the Court finds that the continuous trigger theory is applicable. <u>See</u> <u>supra</u> IV.A.2. State Farm suggests that the continuous trigger theory "has been employed when 'the date of the occurrence of the injury cannot be pinpointed[,]'" citing <u>Franklin Mut. Ins. Co. v. Metropolitan Property & Cas. Ins. Co.</u>, 406 N.J. Super. 586, 592 (App. Div. 2009), and states that it is therefore inapplicable to the instant case because "the evidence is undisputed that the oil release began and ended prior to 2004." [Docket Item 27-1 at 17.]

The Court believes that State Farm misreads <u>Franklin</u>. That case states that the continuous trigger theory is applicable as a method of "allocat[ing] damages between insurers" "if the date of the occurrence of the <u>injury</u> cannot be pinpointed." <u>Franklin</u>, 306 N.J. Super at 592 (emphasis added). State Farm's argument that the date of the <u>oil release</u> can be "pinpointed" to a range of years before its Policy incepted assumes incorrectly that the "date of the occurrence of the injury" is the date of the oil release, and not the date of the property damage to Plaintiffs' property. The Court in <u>Franklin</u> recognized that the continuous trigger theory was appropriate because the "difficulty with environmental contamination claims is that the damage that triggers insurance liability does not occur as the result of a single event, but usually is attributable to events that begin,

develop and intensify over a sustained period of time and therefore, the damages have 'occurred' or been 'triggered' along a continuous timeline during which several successive policies issued to the insured were in effect." 406 N.J. Super. at 591 (internal citations omitted; emphasis added).

"Under the continuous trigger theory, exposure to the harm causing agent is sufficient to trigger potential coverage. Actual manifestation of the injury is not required, so long as there is a continuous, indivisible process resulting in damage. . . . The jury could find property damage occurred during a policy period so long as there is proof that a continuous, indivisible process of injury occurred during that period." Chemical Leaman, 89 F.3d at 995-96.

Because the case law supports an interpretation where the phrase "during the policy period" modifies "which results in property damage," see supra IV.A.2. (citing Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56 (3d Cir. 1982); Owens-Illinois v. United Ins. Co., 138 N.J. 437 (1994); UTI Corp. v. Fireman's Fund Ins. Co., 896 F. Supp. 362 (D.N.J. 1995)); because the Policy itself supports that interpretation in its "Conditions" section; and because such an interpretation would reflect an insured's reasonable expectations, see Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992), the Court

will deny summary judgment to State Farm on this point. There is, at least, a genuine dispute of material fact as to whether the property damage Plaintiffs suffered happened during the policy period of the State Farm Policy, especially under the continuous trigger theory, and summary judgment in State Farm's favor is inappropriate.

### 3. Section II: Pollution Exclusion

State Farm argues that its Pollution Exclusion clause in Section II excludes Plaintiffs' claim from coverage under Coverage L. [Docket Item 27-1 at 18-20.] The Court disagrees.

The relevant exclusion of the Policy reads as follows:

Section II – Exclusions
1. Coverage L – Business Liability and Coverage M – Premises Medical Payments do not apply to:
. . .
     i. bodily injury or property damage arising out of the actual, alleged or threatened discharge dispersal, spill, release or escape of pollutants:
          (1) at or from premises owned, rented or occupied by the named insured;
     . . .
     In addition, Coverage L and Coverage M do not apply to loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants;
     As used in this exclusion:
     . . .
     "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.
     "waste" includes materials to be recycled, reconditioned or reclaimed.

It continues:

> Amendatory Endorsement (New Jersey)
> . . .
> Section II – Exclusions
> The following is added to exclusions 1.i.:
>> This exclusion does not apply to pollution which
>> occurs quickly and abruptly and is accidental.

State Farm focuses the bulk of its argument on the claim that

the Amendatory Endorsement does not apply because there is no

genuine dispute of material fact that the oil leak here

"occurred quickly and abruptly," when the undisputed evidence

allegedly shows that it occurred gradually. [Docket Item 27-1 at

19-20.] State Farm cites to a number of cases applying

substantive state law other than that of New Jersey in support

of this position. [Id.]

However, State Farm does not address the Morton and Nav-Its

line of cases, which holds that, under New Jersey law, pollution

exclusions will not be enforced on the grounds of regulatory

estoppel, except in some cases where the circumstances

constitute "traditional environmental pollution," and the

insurer demonstrates intent on the part of the insured. See

supra IV.A.3. State Farm cites Morton in "accord" with its

position that "sudden" has a temporal component excluding

gradual leaks or contamination, but ignores the applicability of

the actual holding of Morton. [Docket Item 27-1 at 19-20.] To

the extent it attempts to distinguish Morton, State Farm appears

to claim that the language in the State Farm Policy is different because it does not require the pollution to be "sudden and accidental" but rather to have "occurred quickly and abruptly" and be "accidental." [Id. at 20 n.3.] This is not persuasive. See Castoro, 2016 WL 5660438, at *7 (citing Nav-Its, 183 N.J. at 123-24, and describing its holding as "applying the intent requirement in Morton, even though the absolute pollution exclusion in Morton was expressly limited to 'sudden' and 'accidental' injuries, unlike the pollution exclusion in Nav-Its"); Chemical Leaman, 89 F.3d at 991-92 (applying Morton because it "did not believe the New Jersey Supreme Court would enforce the term 'sudden' in non-standard pollution exclusion clauses simply because other language in those clauses varies slightly from that in the standard pollution exclusion.").

The Court will adopt the approach of the Court in Nav-Its in finding that there is no need to address "the ramifications of the" Amendatory Endorsement exception: "[I]f the pollution exclusion is not applicable, neither is the exception to the pollution exclusion." Nav-Its, 183 N.J. at 127.

For the reasons stated above and at IV.A.3., supra, the Court declines to grant State Farm's motion for summary judgment on the basis of the pollution exclusion. The Court finds that there is a genuine dispute of material fact as to whether the

pollution exclusion can apply to the instant case given that it only applies in contexts involving "traditional environmental pollution" and given the failure of State Farm to demonstrate any factual basis from which a reasonable finder of fact could infer that Plaintiffs intended to pollute the Property. Accordingly, the Court declines to rule that Plaintiffs' claim cannot be covered under Coverage L as a matter of law. This issue remains for trial.

### 4. Bad Faith Claim and Punitive Damages

Finally, State Farm alleges that Plaintiffs have not met their burden of showing that State Farm's denial of their claim was made in bad faith, because Plaintiffs have not demonstrated that State Farm's position was not fairly debatable under Pickett v. Lloyd's, 131 N.J. 457 (1993). [Docket Item 27-1.] Plaintiffs did not respond to this argument in their Response [Docket Item 30] and the Court deems it conceded.

Furthermore, the Court agrees, as it did with regard to the bad faith claim against Clarendon, see supra IV.A.6., that Plaintiffs have not adduced circumstances from which a reasonable factfinder could determine that State Farm's position was not fairly debatable. The Court will grant summary judgment to State Farm as to Plaintiffs' claim of bad faith in Count III [Docket Item 1-2 at 7-8].

State Farm also urges that it should be granted summary judgment for Plaintiffs' claim for punitive damages because the standard for punitive damages in this type of case is a showing by clear and convincing evidence of some egregious circumstances or wantonly reckless or malicious conduct by the insurer. This standard for punitive damage liability is obviously "even more exacting than the 'fairly debatable' standard used for establishing a claim for bad faith." [Docket Item 27-1 at 23.] The Court agrees. See Berrol ex. rel. Estate of Berrol v. AIG, No. 07-1565, 2007 WL 3349763, at *2 (D.N.J. July 13, 2007). Accordingly, the Court will also grant State Farm's motion for summary judgment as to Plaintiffs' claims for punitive damages within Count III.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part Clarendon's motion as to Count I (declaring that Plaintiffs are not entitled to recover a first party claim under Section I, Coverage A) and otherwise deny summary judgment as to Count I; grant Clarendon's motion as to Count III (bad faith) of Plaintiffs' Complaint; and deny Clarendon's motion to limit Clarendon's potential coverage liability to 1/20 of the total covered remediation costs. The Court will also grant in part

State Farm's motion as to Count I (declaring that Plaintiffs are
not entitled to recover a first party claim under Section I,
Coverage A) and otherwise deny State Farm's motion as to Count
I; and grant State Farm's motion as to Count III (bad faith) and
punitive damages. The accompanying Order will be entered.


**August 17, 2017**                    **s/ Jerome B. Simandle**
Date                                   JEROME B. SIMANDLE
                                       U.S. District Judge